# Burke's Appeal.

1. Where the answer of a defendant in equity is responsive to the allegations of the bill, said answer is conclusive in the respondent's favor unless it is overcome by the satisfactory testimony of two opposing witnesses, or of one witness corroborated by other circumstances and facts which give it a greater weight than the answer, or which are equivalent in weight to a second witness.

2. The fact that the respondent, in denying that the securities are held in the manner alleged in the bill, sets up the titles in which he *does* claim to hold them, is insufficient to abrogate the above rule; and this upon the ground that the respondent was bound to answer every material allegation of the bill as fully as if specially interrogated thereto; and that unless he had averred the circumstances of his possession his answer would have failed in this particular.

3. A. filed a bill in equity against B. to redeem securities, alleging that the same were held as collateral security for a promissory note. B. filed an answer admitting that a portion of said securities were held in the manner alleged and offering to return the same on payment of the note. As to the residue of the securities he denied the averments of the bill, and alleged, that they had been deposited with him as security for the purchase money of part of them which he had advanced. The transaction with reference to said last named securities was alleged by the answer to have taken place " early in 1879 or thereabouts." Testimony being taken in the cause, the complainant was the only material witness in support of the allegations of the bill. It appeared from his testimony that at the time of the deposit by him of the securities in question with respondent, the latter already held ample security for the promissory note, to secure which complainant alleged that he had made the deposit. The respondent and two other witnesses testified in support of the allegations of the answer. All fixed the date of the alleged transaction with reference to the securities in question in "the early fall of 1878." The amount of these securities was much in excess of the debt to secure

[Burke's Appeal.]

which respondent alleged they had been deposited. The portions of the securities admitted by respondent to be held as alleged by the bill were redeemed by agreement and the cause proceeded as to the residue. *Held*, that the answer was responsive to the allegations of the bill and was conclusive in respondent's favor, the complainant having adduced no sufficient evidence to outweigh it. *Held*, further, that the discrepancy between the dates alleged in respondent's answer and those testified to by his witnesses was immaterial, inasmuch as the answer and the witnesses were in accord as to the principal fact, and that, therefore, there was no conflict of testimony in respondent's case. *Held*, further, that there was no greater inherent improbability in the respondent's story than in the complainant's, so as to render the former less credible than the latter. *Held*, therefore, that the bill should be dismissed.

January 13th 1882. Before SHARSWOOD, C. J., MERCUR, PAXSON, TRUNKEY, STERRETT and GREEN, JJ. GORDON, J., absent.

APPEAL from the Court of Common Pleas, No. 4, of *Philadelphia county*: In Equity: Of July Term 1881, No. 97.

Appeal by Edward T. Burke from a decree of said court requiring him to surrender to William Torrey certain securities pledged for an alleged loan or debt.

The bill in equity, filed by William Torrey against Edward T. Burke and the several corporations whose stock constituted the subject of the pledge, set forth:

1. That on January 2d 1877 the defendant Burke loaned to the plaintiff $4,000, taking his promissory note for that amount, payable twelve months after date, the plaintiff giving Burke, as collateral security, ten of the Texas & Pacific Railway Company's income and land grant bonds, of $1,000 each.

2. That on January 3d 1878, the said loan was renewed for another year, the old note cancelled and a new note given for the same amount. The plaintiff, in compliance with the defendant's demand for additional collateral security, assigned to defendant his interest in the partnership association of Graybill & Company, limited, of which he was a member. Burke thereupon gave Torrey a receipt for the collaterals so held by him.

3. That in January 1879, the plaintiff was again desirous of renewing the said loan, but Burke refused unless additional collateral was given, alleging that the Texas and Pacific Railway bonds had depreciated in value, and that the interest in the firm of Graybill & Co., limited, was of uncertain value. The plaintiff was unable to furnish additional collateral until March 5th 1879, when he assigned to Burke certificates of preferred stock in the Odd Fellows' Temple Association in Ashland, of the par value of $4,000; also a certificate for 191 shares of stock of the First National Bank of Ashland. The former collaterals were retained by Burke.

4. That the plaintiff, desiring to pay the amount of his indebtedness to Burke, on or about September 30th 1880, tendered him the sum of $4,556, being more than the full amount due, with interest, and demanded a return of his securities. That Burke refused to receive the amount and return the securities.

The bill prayed discovery; that Burke be required to accept the amount due him with legal interest, and deliver to plaintiff the said note and collateral securities; that pending the suit, Burke and the other defendants be enjoined from making or permitting any assignment or transfer of said securities; and general relief.

Burke in his answer admitted the averments of the bill so far as they related to the making of the loan in 1877 with security, and its renewal in 1878 with the assignment of the plaintiff's interest in the firm of Graybill & Co. as additional security. The respondent denied the averments of the bill relating to the giving of the said additional collateral security upon its renewal in 1879, in the following language :—

" *Third.* The third paragraph is untrue in every averment relative to the demand for, or the giving additional security for, the debt evidenced by the note of $4,000, or any of its renewals. The security mentioned in this paragraph was given for another debt. The plaintiff, early in 1879, or thereabouts, agreed to purchase from the defendant, and the defendant agreed to sell the plaintiff, seventy shares of stock in the First National Bank of Ashland, of which the plaintiff was then the cashier, for $8,000. For some reasons of his own, which were not explained, the plaintiff desired that the certificate should not stand in his own name, and requested the defendant to retain it, and he did so. As security for this debt of $8,000 the plaintiff requested him to keep the seventy shares, and also gave by way of pledge $4,000 preferred stock of the Odd Fellows' Temple Association of Ashland, and one hundred and ninety-one shares of the First National Bank of Ashland."

The respondent further averred his willingness to receive the debt due him, and to surrender the securities; or to accept either of the debts, and surrender the securities held for each respectively.

Upon the filing of the answer, by agreement of the parties, the complainant paid to the defendant the amount of the original loan, $4,000, with interest, and the defendant re-assigned to the plaintiff the collaterals which he admitted he held as security for that loan, viz., the ten Texas and Pacific Railway bonds and the complainant's interest in the firm of Graybill & Co., limited; and the suit proceeded upon the issue of fact raised by the third paragraph of the bill and answer, as above recited.

The cause was referred to an examiner and master, before

whom the complainant testified in support of the allegations of the bill, and denied the averments contained in the third paragraph of the answer. One other witness was examined on behalf of the complainant, whose testimony, however, did not touch the subject of the disputed transaction of 1879.

The defendant testified in his own behalf as follows :—

Q. Mr. Torrey states, in his bill, that he gave you two certificates of preferred stock in the Odd Fellows' Temple Association, and a certificate for 191 shares of stock of the First National Bank of Ashland; state when these certificates were given to you, under what circumstances, and for what purpose ?

A. These were given to me the last of February, or beginning of March, 1879; in the early fall of 1878 Mr. Torrey having told me that he was buying the shares of the First National Bank of Ashland, I called him in one day, and asked him to buy my seventy shares of stock in the First National Bank of Ashland; he said he would do so, but that he had no money to pay for them at the time; I told him I did not require the money, that all I wanted was security for the same, and that I would give it to him at the rate of six per cent., from January 1st 1879; the amount stipulated for the stock was $8,000; he said that he would take it and would guarantee the stock would pay dollar for dollar, and more; the expression I used was, " Then it is all right, Will, as you run no risk in giving me the security." I did not receive the securities until the following March, I think just before his going to Texas, when he gave me the Odd Fellows' stock and 191 shares of stock of First National Bank, which were both assigned to me; and also told me to keep my seventy shares of stock as collateral security, and any difference, if it didn't pay the amount, he promised me that the other securities would make me safe.

Q. What was the condition of the bank at the time of this contract ?

A. It was in liquidation; in the hands of a receiver, I think.

Q. Was there any prosecution pending or threatened against Mr. Torrey at the time of this contract in relation to transactions of the bank ?

(Objected to by Mr. Brewster.)

A. I believe there was.

Mrs. EMMA M. BURKE, wife of the defendant, testified as follows :—

Q. Have you ever heard any negotiations, or conversations between Mr. William Torrey and your husband in reference to the sale and purchase of certain shares of stock in the First National Bank of Ashland; if so, state all that you heard said

3 OUTERBRIDGE.—23

by both the parties upon the subject, when it occurred, and where it occurred?

A. I have heard a statement of the facts in our house in the latter part of August, or beginning of September, when Mr. Burke offered Mr. Torrey his stock for the amount of $8,000, and Mr. Torrey said he would take it at that; Mr. Torrey said then that the stock in the bank would bring dollar for dollar, and more; Mr. Burke said to him, " Will, you will run no risk in taking mine;" Mr. Burke wanted to transfer his shares over to him, Mr. Torrey objected, said he was not ready to take them, and wanted Mr. Burke to keep them, so that he could act as director of the bank, as before. Mr. Torrey said he would give him additional security in his own stock, but could not then, as they were then out as collaterals, but he would get them as soon he could shape it, or something of that kind. Mr. Burke then said by giving him additional security, for the $8,000, and by paying six per cent. from the 1st of January 1879, he could have it until such time, as he was able to pay ; Mr. Burke did not get those securities until the coming March, my husband handed them to me; I have his securities in my charge.

Cross examined: The date of the conversation between Mr. Torrey and my husband was the latter part of August, or the beginning of September 1878, as near as I know it.

Mrs. JULIA C. WILFORD, a sister of Mrs. Emma M. Burke, testified that she was present during a part of the conversation above referred to, and that it took place " in the summer of 1878."

The master reported, inter alia, as follows: " The only issue remaining for consideration is, were the securities which are retained by defendant held as security for the loan of $4,000, which has since been paid?

" The defence set up in the answer is that the $4,000 Odd Fellows' Temple Association stock and the one hundred and ninety-one shares of the stocck of the First National Bank of Ashland, were not assigned to defendant, Burke, as additional collateral security for the payment of the $4,000 note, but as collateral security for the payment of the purchase-money of seventy shares of said bank stock alleged to have been sold by Burke to Torrey for $8,000, but which had never been transferred or delivered.

" The improbability of this alleged contract appears upon the evidence. Mr. Burke and Mr. Torrey were both connected with the First National Bank of Ashland: Mr. Burke as director and president, and Mr. Torrey as cashier. In February 1878, while Mr. Burke was a director, the bank was declared insolvent. . . . .

" The contract set up by defendant would amount to this, that Torrey bought for $8,000 seventy shares of stock, par value

only $7,000, which he knew, and Burke must have known, were not worth more than $2,800 or $3,000 : and that Torrey transferred as collateral security for the purchase money thereof, 191 shares of the identical bank stock, and also $4,000 of Odd Fellows' Temple stock, and all this without delivery of the article or stock alleged to have been sold.

"From the testimony of the defendant and his two witnesses, it appears that the answer is not supported by the evidence, in fact, that it is contradicted by them. The answer says :— 'The plaintiff, early in 1879, or thereabouts, agreed to purchase from the defendant, and the defendant agreed to sell 70 shares of stock in the First National Bank of Ashland, of which the plaintiff was then cashier, for $8,000.'

"The defendant, Burke, in his testimony, says it was in the early fall of 1878 that Torrey agreed to purchase the said 70 shares of stock. Mrs. Burke, the wife of defendant, and Mrs. Wilford say that it was the latter part of August, or beginning of September 1878, when Mr. Burke offered Mr. Torrey his stock for $8,000. They also say that no securities were mentioned, and that they were not present when any securities were handed by Torrey to Burke.

"If these witnesses testify truly when they say the contract was made in 1878, then the answer which says the contract to purchase the said 70 shares was made in 1879 is untrue; but if the answer is true, then it is unsupported by any of the evidence.

"From a careful consideration of all the evidence the master is satisfied that the facts stated in the plaintiff's bill are true."

The master therefore reported a decree that the defendant deliver and surrender to the plaintiff the said stock in the Odd Fellows' Temple Association, and the 191 shares of stock in the First National Bank of Ashland.

The plaintiff filed the following exceptions to the master's report :—

1. That the master has misstated or misapprehended the rule for the application of the evidence to the issue. He has assumed that the defendant was bound to maintain the claim to hold the collaterals for a debt due for the sale of stock to the plaintiff. Whereas the answer being responsive to the bill to redeem the collaterals, it lay on the plaintiff to disprove the existence of the right under which the defendant claimed to hold the collaterals.

2. If the plaintiff was bound to disprove the averment in the answer, then there was no proof to countervail the effect of the answer.

3. The master has erred in the finding of the facts. The evidence of the plaintiff that the collaterals were given as ad-

ditional security for the original loan, being supported by the plaintiff's testimony alone, and the defendants' claim to hold them as security for another debt contracted at a subsequent time, and before the pledge was made, being supported by the oaths of three witnesses.

The court, after argument, overruled the exceptions, THAYER, P. J., filing an opinion, in which he said :—

" We have read every word of the evidence taken by the examiner in this case, and approve the finding of the master. . . . One witness with corroborating circumstances was sufficient to establish the plaintiff's case, while the allegations upon which the defence rests are so exceedingly improbable as to be altogether incredible, unless sustained by the clearest proof. . . . No one but a lunatic would have made such a contract. The motive insinuated rather than alleged by the defendant, that a prosecution was threatened, is not supported by a scrap of credible evidence, for surely no weight can be attached to the defendant's feeble answer, " I believe so," to the question of counsel on page 13, unaccompanied by any explanation or statement of particulars, or by the slightest corroboration. Very clear and satisfactory evidence would be necessary to sustain such a story as that which the defendant sets up. The fragments of conversation sworn to by the defendant's wife and sister-in-law are totally inadequate to convince our judgments of the truth of it, particularly when we consider the relations of those persons to the defendant, the natural influence which the defendant would have over them, and the contradictions of them contained in the defendant's answer and in the proofs presented by the plaintiff. That the burden of proving these extraordinary statements rested upon the defendant admits of no doubt, for when the answer sets up affirmative allegations in opposition to or avoidance of the plaintiff's demand and is replied to by the plaintiff, the answer is of no avail in respect to such allegations, and the defendant is as much bound to establish the allegations so made by independent testimony, as the plaintiff is to sustain his bill. . . . The defendant has not removed this burden from his shoulders by any satisfactory or convincing evidence, and as he admits that the securities in controversy belong to the plaintiff, and has failed to establish by any sufficient proof that he holds them as a pledge under the remarkable contract which he sets up, the decree must be for the plaintiff.

" Exceptions dismissed, and it is ordered that a decree be made for the plaintiff in the form reported by the master."

The defendant took this appeal, assigning for error, substantially, the dismissal of his exceptions, the confirmation of the master's report, and the decree of the court.

*R. C. McMurtrie*, for the appellant.—The answer was directly responsive to the bill. The fact that, in addition to denying that the collaterals in question were held as security for the $4,000 loan, it set forth affirmatively the other indebtedness, for which they *were* held as security, did not make it the less responsive, nor deprive the respondent of the benefit of the rule, that being responsive, it is conclusive, unless contradicted by two witnesses or by one witness and corroborating facts. This is directly decided in Eaton's Appeal, 16 P. F. Smith 483, and is consistent with the general rule as laid down in Gresley's Eq. Evidence 4, and all the authorities. The slight discrepancy in date between that averred in the answer and the recollection of the defendant's two witnesses, is immaterial, they having supported the answer as to the main transaction. "Inherent improbability" and the apparent "absence of motive" are insufficient to discredit a sworn answer, but when it is remembered that the plaintiff, as an officer of the insolvent bank, was at the time threatened with a criminal prosecution, his motive in buying up the shareholder's stock is sufficiently apparent.

*F. Carroll Brewster*, with him *F. E. Brewster* and *F. C. Brewster, Jr.*, for the appellees.—The averments of the bill were supported by the testimony of one credible witness and corroborating circumstances.

The testimony of the defendant being in conflict with his answer, the effect is to impeach and overthrow the answer: Spencer and Newbold's Appeal, 30 P. F. Smith 317.

The burden of proof was shifted upon the defendant below to maintain his allegations by satisfactory proof. For, although the answer was positive in its denial, yet it set up an affirmative case in opposition to that of the plaintiff below, and where the answer sets up affirmations in opposition to or in avoidance of the plaintiff's demand, and is replied to by the plaintiff, the answer is of no avail in respect to such allegations. In such a case the defendant is as much bound to support his affirmative averments by independent testimony as the plaintiff is to sustain his bill: Daniell's Ch. Pr. 984; Pusey *v.* Wright, 7 Casey 395; Adams Eq. 21; Swift *v.* Dean, 6 Johns. 522; Clason *v.* Morris, 10 Id. 524; Atkinson *v.* Marks, 1 Cow. 691.

Mr. Justice STERRETT delivered the opinion of the Court, February 20th 1882.

The question of fact upon which the case hinged in the court below was whether the stocks in controversy, one hundred and ninety-one shares of First National Bank of Ashland, and one hundred and sixty shares of Odd Fellows' Temple Association, were pledged as additional security for $4,000, borrowed

money, or as collateral security for $8,000, the consideration for seventy shares of bank stock which appellant alleged he had sold to appellee.

In the bill filed to redeem these stocks and other collateral securities, the appellee substantially avers that in January 1877 he borrowed from appellant $4,000, for which he gave his note at one year, with ten Texas and Pacific Railway Company's bonds, of $1,000 each, as collateral security; that in January 1878, the note was renewed for one year with the same collateral, and shortly thereafter he assigned his interest in the limited partnership association of Graybill & Co. as additional collateral security; that when the last mentioned note matured he again desired to renew the loan, but appellant was unwilling to do so unless additional collateral was given, assigning as a reason therefor that the Texas and Pacific Railway bonds had depreciated, and that the interest in the firm of Graybill & Co., theretofore assigned to him, was of uncertain value; that he was compelled to comply with appellant's demand for additional security, but was unable to furnish it until March 1878, when he gave him the one hundred and ninety-one shares of bank stock and one hundred and sixty shares of Odd Fellows' Temple Association stock first above mentioned; and thus the loan of $4,000, was again extended for one year from January 1879, but the note of January 1878, instead of being renewed, was held by appellant with all the before-mentioned collaterals as security for the payment thereof.

The appellant in his answer admits all the material averments as to the original loan of $4,000, and the first renewal thereof; but he denies that he either demanded or received any additional security for that loan when it matured in January 1879, or at any time thereafter, and says the bank stock and Odd Fellows' Temple Association stock were pledged by appellee for another debt, which he alleges was contracted and secured as follows :—" The plaintiff, early in 1879, or thereabouts, agreed to purchase from the defendant, and the defendant agreed to sell the plaintiff seventy shares of stock in the First National Bank of Ashland, of which the plaintiff was then cashier, for $8,000.    For some reasons of his own, which were not explained, the plaintiff desired that the certificate should not stand in his own name, and requested defendant to retain it, and defendant did so.    As security for this debt of $8,000, the plaintiff requested him to keep the seventy shares, and also gave, by way of pledge, $4,000, preferred stock of the Odd Fellows' Temple Association of Ashland and one hundred and ninety-one shares of the First National Bank of Ashland."    He also avers he is and always has been ready and willing to surrender the securities

aforesaid on payment of the debts for which they were respectively pledged.

By mutual agreement, immediately after the answer was filed, the loan of $4,000 was paid, and the collaterals, which appellant claimed to hold as security therefor, were surrendered to the appellee. The issue was thus narrowed down to the question of fact first above stated.

The learned master found that the stock was pledged as security for the loan, and not for the alleged debt of $8,000, and the court accordingly entered a decree in favor of the plaintiff below. It is contended there was error in thus finding the controlling fact against appellant, and that this resulted from the refusal of the court to consider the answer, in this respect, as responsive to the bill, and in not giving due weight to appellant's testimony.

If the answer, denying that the stock in question was ever given as additional security for the loan, and averring that it was specifically pledged for the debt, is responsive, the appellant was clearly entitled to the benefit of the rule that makes it conclusive evidence in his favor unless it is overcome by the testimony of two witnesses, or one witness and corroborating circumstances: Horton's Appeal, 1 Harris 67; Pusey v. Wright, 7 Casey 387, 395; Story's Eq. Jurisprudence, § 1528. In the latter, it is said that the answer of the defendant to any matter stated in the bill, and responsive to it, is evidence in his own favor. It is not only proof as to the matters of fact of which the bill seeks a disclosure from him, but it is conclusive in his favor, unless it is overcome by the satisfactory testimony of two opposing witnesses, or of one witness corroborated by other circumstances and facts which give it greater weight than the answer, or which are equivalent in weight to a second witness. Thus where the defendant, in express terms, negatives the allegations of the bill, and the evidence is only of one person, affirming what has been so negatived, the court will dismiss the bill. The reason of the rule, as stated by the learned author, is this: The plaintiff calls upon the defendant to answer an allegation of fact, which he makes; and thereby he admits the answer to be evidence of that fact. If it is testimony, it is equal to the testimony of any other witness; and, as the plaintiff cannot prevail, unless the balance of proof is in his favor, he must either have two witnesses, or some circumstances in addition to a single witness, in order to turn the balance. In so far as the answer contains an express denial of the allegation that the stock was pledged as security for the loan, it is undoubtedly responsive. If the burden of overcoming a responsive answer, as to the cardinal fact in his case, was on the plaintiff, his own testimony alone was clearly insufficient for that

purpose; and we fail to discover any other evidence, facts or circumstances to corroborate his statement in that respect.

Both parties agree, that in March 1879, the stock was given as collateral, but they disagree as to the specific purpose for which it was pledged. One of them asserts, as the foundation of his equity, that it was additional security for the loan; the other avers that it was collateral to the alleged debt. It is not pretended that it was the subject of contract between them at any other time, or for any other than one of the purposes above mentioned. The appellant was required to answer every material allegation in the bill as fully as if specially interrogated thereto; and it was his right, as it was clearly his duty, to make full disclosure of all the facts and circumstances connected with and forming a part of the transaction in which the stock was pledged. Without doing so, how could he conscientiously swear that the facts stated in his answer were true? If the stock was not his, and he did not hold it in his own right absolutely, it was not only his duty to say so, but also to state fully the terms and conditions on which it was received and held by him. This is what he did; and it appears to us that his answer cannot be fairly regarded in any other light than as responsive to the controlling averment of the bill. In this respect, the case cannot be distinguished in the principle from Eaton's Appeal, 16 P. F. Smith 483, in which the distinctive features of a responsive answer are clearly pointed out by the present chief justice. The bill in that case, for the settlement of a partnership composed of three persons, averred that they were equal partners. One of the defendants, in his answer admitting the partnership, alleged that his own interest in the firm was four-ninths instead of one-third, and that of the plaintiff was only two-ninths. The answer was held to be responsive to the bill, and therefore entitled to the weight assigned to it by the well settled rule of evidence in equity. The leading cases there cited fully sustain the principle. In Allen *v.* Mower, 17 Vermont 61, it is said that everything in the answer, as to the creation of the original liability charged in the bill, must be taken together as part and parcel of one entire transaction. In Dunham *v.* Jackson, 6 Wend. 22, the bill, filed to redeem stock, charged that it had been pledged for a certain sum. The answer alleged it was pledged at the same time for an additional sum, and it was held to be responsive. The learned judge, in that case, speaking of the defendant's answer, said: "Whether he has gone beyond what he was required to do may be tested by supposing an interrogatory, inserted in the bill, pointing to the very matter which he has answered, and he had refused to answer. Would the court have compelled an answer? Interrogatories are not a necessary part of a bill, nor are they to be answered unless they

are such as are warranted by the premises and allegations of the bill.   If the respondent had stopped after denying that the stock was pledged for the loan of $500, and refused to answer an interrogatory as to the amount for which it was pledged, because such interrogatory was not warranted by the bill, there would have been, it appears to me, very little difficulty in showing the answer to be insufficient.   The defendant is bound to admit or deny the facts stated in the bill, with all their material circumstances, without special interrogatories for that purpose."   But further reference to authorities, sustaining the principle contended for by appellant, is unnecessary.   They are cited and discussed at length in Eaton's Appeal, supra. Enough has been said to show that upon principle, as well as authority, the answer was responsive, and appellant should have had the benefit of the rule above stated.

But aside from this, we are of opinion that due weight was not given to the testimony introduced by the appellant in support of his answer.

The learned master came to the conclusion that the answer was not only unsupported, but was actually contradicted by the testimony of appellant and his witnesses.   This was an error into which he appears to have been led by attaching too much importance to a discrepancy, more apparent than real, between the answer and the testimony, as to the time appellee agreed to purchase the seventy shares of bank stock.   It is alleged in the answer that it was "early in 1879, or thereabouts."   In his testimony the appellant says it was in the early fall of 1878 : and his wife testifies it was in the latter part of August, or beginning of September 1878.   The important fact was the agreement to purchase the stock, not the precise time it was originally concluded or subsequently recognized by the parties.   If made at all, it was a verbal contract in which further action was not contemplated before January 1879 ; and, if appellant's testimony is believed, final action thereon was postponed, at the instance of appellee, and for his convenience, until March following.   The discrepancy as to dates was comparatively immaterial, and altogether insufficient to cast discredit on the testimony of appellant and his witnesses.

An additional reason assigned for discrediting the answer and testimony, was the inherent improbability of the allegations upon which the defence was based.   The learned judge of the Common Pleas appears to have regarded this as conclusive against the appellant.   It must be conceded, that the circumstances connected with the alleged purchase of the bank stock, indicate great folly on the part of the appellee, but it does not necessarily follow that witnesses are unworthy of credit merely because their testimony tends to establish unreasonable or fool-

[Pleasonton's Appeal.]

ish contracts. The motives which prompt such transactions cannot always be discovered. There is nothing in the appellee's version of the transaction to specially commend it to credence, on the score of inherent probability. The $4,000 loan was already secured by the Texas-Pacific bonds and the interest in the firm of Graybill & Co.—collaterals then worth about $6,000— and yet, according to his statment, he gave the stock in controversy, worth probably twelve or thirteen thousand dollars, as further and additional security for the loan. While it is possible that collaterals, worth fifty per cent. more than the amount of the loan, may have been supplemented by additional security worth double that amount, the transaction is not one that a prudent man would be likely to make. Indeed, the inherent improbability of such a transaction is nearly if not quite as great as that involved in appellant's version of the matter.

A careful consideration of the bill, answer and testimony leads us to the conclusion, that due weight was not given either to the answer or the testimony by which it was supported, and that the bill should have been dismissed.

Decree reversed, and bill dismissed; and it is ordered that the costs, including the costs of this appeal, be paid by the appellee.